IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

IN THE MATTER OF THE SEARCH OF:
**ANDROID REVVL CELL PHONE**
**IMEI: 357492494652793**
LOCATED AT THE FBI OFFICE IN
LEXINGTON, KENTUCKY

Case No. 5:22-MJ-5372

### AFFIDAVIT IN SUPPORT OF
### APPLICATION FOR A SEARCH WARRANT

I, Chelsea Holliday, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been employed in this capacity since 2018. I am currently assigned to the Louisville Division of the FBI and have primary investigative responsibility for white collar crimes and public corruption violations. I am trained and authorized to investigate the offenses alleged herein. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. § 242, and I am authorized by the Attorney General to request a search and seizure warrant. Before becoming a Special Agent, I was employed as a deputy sheriff and investigative agent by the Brevard County Sheriff's Office in Florida. I have experience investigating public corruption and fraud violations and have been involved with investigations in which the subjects that committed public corruption and financial fraud violations were successfully prosecuted. During my career, I have investigated and assisted with multiple investigations involving searches of computer systems and seizures of computers and other electronic storage devices. In these prior investigations and in the present case, FBI employees with specialized training in computer

1

forensics have assisted me with setting forth computer search parameters and have imparted their computer forensics knowledge to me. As a federal law enforcement officer, I am authorized to execute search and seizure warrants issued under Rule 41 of the Federal Rules of Criminal Procedure.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. I am familiar with the investigation described below. I have probable cause to believe that a search of the property which is the subject of this affidavit will reveal evidence of violations of 18 U.S.C. § 1346, honest services fraud.

4. I make this affidavit in support of an application for a search warrant for an **Android REVVL cell phone bearing IMEI: 357492494652793** (hereafter "target phone"). The target phone was provided to the FBI in June 2022 by a Private Attorney who advised they obtained it from a man named Joseph McCarty, who allowed them to conduct a forensic search of the phone.

5. In order to search the target phone for additional evidence pertaining to the FBI's investigation, I am seeking authority to search the target phone described in the following paragraphs and in Attachment A, and to search any electronically stored information as described in Attachment B to this affidavit. For the reasons set forth below, I respectfully submit that this Affidavit contains probable cause to believe that the item to be searched contains evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 1346, honest services fraud.

**JURISDICTION**

6. This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

7. The United States government, including myself, FBI Special Agent Chelsea Holliday, is investigating two individuals, RONNIE GOLDY and MISTY HELTON, for violations of 18 U.S.C. §§ 1343, 1346, 1349, and 666(a)(1)(A) and (a)(2). There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

8. In May 2022, the FBI received a complaint from a Private Attorney (hereafter "complainant") out of Louisville, Kentucky, regarding Ronnie Goldy (hereafter "Goldy"), the Commonwealth Attorney for the 21st Judicial District in Kentucky. Goldy became Commonwealth Attorney for this district in 2012. The complaint alleged that Goldy was receiving sexually explicit photos and videos from a criminal defendant named Misty Helton (hereafter "Helton") in exchange for using his official position as Commonwealth Attorney to assist her with her criminal charges. Goldy allegedly had several of Helton's criminal cases dropped, provided her with law enforcement sensitive information and had some of her criminal warrants recalled after she missed court dates.

9. The complainant provided the FBI with screenshots and summaries of Facebook messages showing the exchange of nude photos and videos from Helton to Goldy for preferential treatment of Helton's criminal cases by Goldy from 2018 through 2020. The complainant advised they possessed a mobile phone (the target phone) containing screenshots of these Facebook messages, and that the complainant had the phone analyzed by a private digital forensic examiner.

3

The forensic examiner hired by the complainant is a retired law enforcement officer who has extensive experience in conducting digital examinations and was previously a Task Force Officer for the FBI.

10. In June 2022, the FBI received copies of screenshots from the complainant showing the Facebook messages between Goldy and Helton. With these screenshots, the FBI identified Goldy and Helton's Facebook accounts as **www.facebook.com/ronnie.goldy** and **www.facebook.com/QueenOfThe606**.

11. In July 2022, the FBI obtained search warrants for Goldy and Helton's Facebook accounts and received certified copies of the messages between Goldy and Helton. The certified copies of Facebook messages between Goldy and Helton were consistent with the summaries provided by the complainant. Furthermore, it appeared Goldy had deleted the messages between him and Helton; however, the messages were still present on Helton's account.

12. In July 2022, the FBI interviewed the alleged owner of the target phone, Joseph McCarty (hereafter "McCarty"). McCarty advised the following in summation: McCarty and Helton had a child in common. The last time McCarty got out of jail, around the Spring of 2022, Helton gave McCarty an old cell phone of hers to have (the target phone). Helton accidentally left her personal Facebook account logged in on the phone, so McCarty read her Facebook messages and located the messages between Helton and Goldy. McCarty was hanging out with a friend of his named Champ Maze (hereafter "Maze") one day and accidentally left his phone in Maze's car. Maze took the phone and gave it to his ex-wife, Beth Maze's, attorney, after hearing about the alleged messages between Helton and Goldy that were on the phone. Beth Maze's attorney asked McCarty for permission to examine his phone and copy the messages off and McCarty gave him permission. McCarty did not want to have the phone back.

4

13. The Facebook messages between Goldy and Helton included numerous instances where Goldy utilized his position as Commonwealth Attorney to assist Helton with her criminal cases, sometimes in exchange for nude photos. Some of the messages are quoted and/or summarized below (dates are approximate; records from Facebook were provided in UTC, therefore affected dates have been converted into EST/EDT):

1) May 3, 2018 - Helton tells Goldy she has been pulled over by police and she gave them "Daph's" name as her identity, instead of her own. She then says she will need to "pay her off" when "Daph" finds out she has court in Lexington because of Helton using her identity. Goldy responds, "Lol." Goldy also tells Helton that she doesn't need to allow the police to search her car.

2) May 4, 2018 - Helton sent Goldy 8 seductive and nude photographs. After viewing the images, Goldy stated, "Wow. Nice. I do have most of those I think. But they are very nice. I'm sure you have some even better."

3) May 4, 2018 - The conversation then turned to discussing additional pictures and videos. Goldy stated, "Video certainly sounds interesting." Later the same day, Goldy asked, "Any luck finding that video."

4) May 9, 2018 - Helton asked Goldy if he knew of a way she could "earn" some money for gas and job hunting. Helton stated, "Will you help me out with some money today? I will earn it or I will pay you back when I get my first check. Either way is fine. I found all my pics and videos but they gotta be worth a lil something , right!"

5) June 15, 2018 - The following messages were sent:

   a. "Goldy: When do I get to see a video

      b. Helton: When am I not gonna have a warrant hahaha

      c. Goldy: Lol. Good point

      d. Goldy: Incentives never hurt.

      e. Helton: Lol, I'm not all the way stupid hahahaha

      f. Helton: Have u mentioned it to him and he won't go for it or what?

      g. Goldy: Not at all. But hey I can wish right.

      h. Goldy: He's not dead set against it he's just been super busy with trials.

      i. Helton: I am trying to get all my ducks in a row but it is kind of hard with it still being active. I got a job at the distribution center on 801 and start Sunday night but if I start and then get picked up then there is yet another job gone. I'd rather tell them I can't start until later instead of ruining it all together.

      j. Goldy: I'll try and speed it up."

6) June 16, 2018, through June 23, 2018 - The following messages were sent:

      a. "Helton: Do you know anything about federal cases? I know you don't have jurisdiction over that obviously but just didn't know if you knew anything about it, how it works, etc.

      b. Goldy: Depends on case why

      c. Helton: So many weird things keep happening

      d. Goldy: Like?

      e. Goldy: I mean if you want to show me some weird videos I'm cool with that. Lmao."

7) June 27, 2018 - The following messages were sent:

6

  a. "Goldy: You owe me big time.

  b. Helton:  Why? Lol

  c. Goldy:  Judge is about to withdraw some warrants.

  d. Helton:  YESSSS!!!"

8) July 26, 2018 - Goldy sent: "Don't you owe me a video? Lol" and, "Yes I am right. U owe me a very good video or two."

9) August 7, 2018 - Goldy sent, "Didn't you forget to send me something? Lol" and "Well we need to fix that."

10) August 20, 2018 - The following messages were sent:

  a. "Helton:  Thank you so so so much

  b. Goldy: You are killing me. Lol Though I do expect some videos (more than 1) this time.

  c. Helton: Hahahaha, well i suppose I may be able to do that for you. We still need to meet up, if we are ever able to get on the same page. Lol

  d. Goldy: There should be any I may do that. It should be I will do that ASAP. Lol. We can meet anytime you want.

  e. Helton: I have to get one off my other phone. I just got a new one recently. Well, I guess I could make a new one but…   That would be a task, mid day yet still not impossible, i don't guess. Haha. You DID get a bond taken case of on a Sunday, I suppose. & I am currently trying to figure out how to get my vehicle out of impound (only me 😊) and then I'll let you know about meeting?

  f. Goldy: Now you're thinking right."

11) August 21, 2018 - Goldy stated, "Don't get off topic. You still owe me videos. Can't tease and then not deliver."

12) September 23, 2018 - The following messages were sent:

   a. "Helton: Can you get a court date changed for me??

   b. Goldy: U notice you keep asking but not giving. Lol Which court date ?

   c. Helton: what do you want me to give?

   d. Helton: and it is clark county tomorrow.

   e. Helton: I know it is not your jurisdiction but didnt know if you would have a trick up your sleeve for someone very dear to your heart LOL.

   f. Helton: its all because if I got to court tomorrow that i will be in jail for a moco warrant over that fine. i have been struggling so bad becasue i lost my job when i went to jail it took me a bit to find another one. If i go back to jail tomorrow, this job is gone as well. I had to pay to get my car out of impound and catch up on all of my bills. I have been trying to come up with the money to just pay it tomorrow before court but thats a joke becasue everyone is only out for themselves.

   g. Helton: i dont get paid again until next week. Judge said that if i am in his courtroom again over this then I am doing every day of 6 months.

   h. Goldy: I'm still waiting on those videos remember. Lol

   i. Goldy: I can see what I can do. What time is court."

13) September 27, 2018 - Goldy was asked by Helton to continue a case in Clark County so she would not go to jail. She mentioned she also had a fine to pay in

8

Montgomery. On September 28, 2018, Goldy replied, "Ok. I'll see if I can take care of Clark. U focus on Montgomery"

14) October 23, 2018 - Goldy stated, "Got your Rowan county stuff done. You are completely free of that. Still working on Clark county. They are a pain." After this message, Helton sent Goldy a nude picture.

15) 2019 and 2020 - Helton asked Goldy on multiple occasions to check an online system named eWarrants to see if she had a warrant. She also asked if he would run a name through the system to search for warrants and he did.

16) February through March 2020 - Goldy assists Helton with getting paperwork done to get her car out of impound after it was impounded by the police after Helton was arrested. Helton offers Goldy $500 for helping Helton do the paperwork to get her car back.

17) March 3, 2020 – The following messages were sent:

   a. "Goldy: Hey. You know Meghan sparks right?

   b. Helton: Yes, i do. Why?

   c. Goldy: I knew she was in drug court. I check on her every now and then. She seems nice. Last time she said she was struggling. I was just curious if she was doing ok.

   d. Helton: I wrote her yesterday to see if she wanted to go to Lexington but was working and couldn't talk but just for a second so i never got to ask her.. But i seen her later when i was looking on arrest.org for a sanction, I wanna say last week, but i could be way wrong.. It could have been the first of this week.

9

e. Goldy: You girls are going to be the death of me. Lol"

18) March 25, 2020 - Helton sent: "Side note. I get this car thing done you have to get with Megan and we meet up somewhere. When we are not on lockdown. Lol."

19) April 14, 2020 - Helton asked Goldy if he knew of a way she could earn some money stating:

   a. "Helton: You interested in helping me make some money?? Any ideas?? Videos?? Anythin?

   b. Goldy: Just got the order extending the restrictions on court through May 31. So I would say you won't have court.

   c. Goldy: Could always do the private snap chat videos. I know a girl who made a bunch of $$ doing that. Lol

   d. Helton: Seriously. With everything shit down I'm not sure

   e. Helton: How do you do that??

   f. Helton: Private SC??

   g. Helton: Is it with people I know or what?

   h. Helton: And I got video for you if you are willing to buy? All jokes aside I'm being serious."

20) April 19, 2020 - Goldy and Helton discuss Helton sending Goldy nude pictures and videos for money.

21) August 4, 2020 - Helton asks Goldy, "Hey will you check and see if Shelia Conrad has an active warrent In either Bath or Rowan County?" Goldy replies, "Looks like she does."

22) November 6, 2020 - Helton stated, "I freaking forgot about court yesterday." Goldy replied, "Oh no, Call Charles and tell him. I'm sure it won't be a big deal." Goldy also said, "Haven't been able to get judge yet. But I'll take care of it."

14. In September 2022, Goldy and Helton testified in an evidentiary hearing held by the Kentucky Bar Association regarding allegations of abuse of position by Goldy. During the hearing, Goldy, in essence, stated he did not remember sending the Facebook messages to Helton. During her testimony, Helton advised Goldy helped her in court cases for approximately the past seven years in exchange for sexual favors and nude pictures and videos. Helton advised she constantly felt indebted to Goldy.

15. Based on my training and experience and my knowledge of this investigation, I have cause to believe that Goldy and Helton reached a quid pro quo agreement, in which Goldy agreed to accept a thing of value (i.e., sexually explicit photos and videos from Helton) in exchange for the use of Goldy's official position as Commonwealth Attorney to assist Helton with her criminal cases.

16. The FBI obtained information about Helton's criminal history through CourtNet.[1] Helton's CourtNet records included 15 separate criminal cases filed between 2014 and 2021. The venues and timing of certain court actions appear to correspond to specific cases referenced in Goldy's message exchanges with Helton. For example, on September 27 and October 23, 2018, Helton and Goldy corresponded about pending cases in Montgomery, Rowan, and Clark Counties (see items 13 and 14 above). Based on the CourtNet history, Helton was required to post a cash bond on or about August 30, 2018, regarding a case in Montgomery County (which had been filed in or about March 2016); Helton was charged with various crimes in Clark County in or about

---

[1] CourtNet is a database available to law enforcement that contains information about cases filed in Kentucky courts.

August 2018 and resolved the case by guilty plea in or about May 2019; and Helton was charged with crimes multiple times in Rowan County between May 2015 and May 2017, receiving either outright dismissals or suspended sentences that presumably subjected her to continued court supervision. Further, the FBI's review of Helton's CourtNet records identified numerous criminal charges filed against her in Bath, Rowan, and Montgomery Counties.

17. Based on open-source information, the 21st Judicial Circuit (in which Goldy is the Commonwealth's Attorney) covers Bath, Menifee, Montgomery, and Rowan counties. Thus, Goldy was in a position during this timeframe to assist Helton with any of the aforementioned cases. Information about the disposition of each case was not consistently available through the CourtNet history, but the available information is appended to this affidavit as Exhibit A. Notably, based on the available disposition information, many of Helton's criminal charges were either "dismissed" or "amended."

18. Items 19 and 20 of the summaries above show that in April 2020, Goldy and Helton discuss Helton making "money" off selling videos to customers through social media such as SnapChat. Therefore, these summaries show that Goldy and Helton both found economic value in the images or videos. The messages depicted above give reason to believe that the images at issue in the April 2020 discussion were likely similar to the ones Helton had already provided to Goldy in return for his assistance with her criminal cases. Furthermore, Helton and Goldy followed this exchange with continued discussion of Goldy using his position to affect the outcome of criminal matters in which Helton was a defendant. This includes Item 22 of the summaries above, a November 6, 2020, discussion in which Goldy states he will "take care" of a matter involving an arrest warrant for Helton's failure to appear. Helton's CourtNet history indicates that she was

released on bond on November 6, 2020, in connection with a Bath County action that had been filed in or about August 2019.

19. Based on public information, I know that each Commonwealth Attorney derives funding from and is an agent of the government of the Commonwealth of Kentucky, which itself receives a substantial sum (well in excess of $10,000) of federal funding each year.

20. Based on my training, experience, and knowledge of this investigation, including the foregoing information, I believe that the target phone will have evidence, fruits, and instrumentalities of color of law violations, including, but not limited to phone calls, text messaging, images, videos, and electronic messaging.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments,

13

and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another

location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

22. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available at https://www.t-mobile.com/cell-phone/t-mobile-revvl-6-5g, I know that the target phone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

   a. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the target phone was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the target phone because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

16

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the target phone consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the extraction to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the

physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. Based on the aforementioned, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the information described in Attachment A to seek the items described in Attachment B.

## SEALING REQUEST

27. I respectfully request that this Affidavit and the application and search warrant be sealed until the execution of the search warrant. Disclosure of the Affidavit at this time would also seriously jeopardize the ongoing investigation, as the target would not otherwise be aware of the scope of this warrant or that their activities are currently the subject of an ongoing federal investigation. Disclosure at this time would provide the target with the opportunity to destroy evidence, change patterns of behavior, notify co-conspirators, or flee. Furthermore, the investigation in this matter is continuing, and disclosing the Affidavit's contents prior to execution will likely preclude or impede the agents and investigators working on this matter from investigating new criminal activity or leads.

Respectfully submitted,

/s/ Chelsea Holliday

Chelsea Holliday
Special Agent
Federal Bureau of Investigation

Attested to by applicant per FRCrP 4.1 by reliable electronic means on this 20th day of October, 2022.

_____
HON. MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE